UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANEITA CHERRY,

Plaintiff,

v.

ANGELA DALTON, et al.,

Defendants.

_______________________________/

Case No. 2:25-cv-13085

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS [10]**

On October 2, 2022, Kyle Cherry passed away due to a fentanyl overdose while he was incarcerated at the Macomb Correctional Facility. After Cherry's death, his mother, Janeita Cherry, as the personal representative of his estate, sued multiple Michigan Department of Correction ("MDOC") officials in their individual capacities under 42 U.S.C. § 1983. ECF No. 1. In short, the Estate alleged that Defendants violated Mr. Cherry's constitutional rights by allowing unfettered access to drugs in the prison and that the drugs ultimately caused his death. Defendants all asserted qualified immunity and moved to dismiss the case for failure to state a claim. For the following reasons, the Court will grant Defendants' motion to dismiss.

**BACKGROUND**

I. Factual Background

Kyle Cherry was incarcerated at the Macomb Correctional Facility. On October 2, 2022, his cellmate found him unresponsive, and he never awakened. ECF No. 14,

PageID.120. An autopsy report revealed that Cherry's cause of death was a fentanyl overdose. *Id.* The Estate alleged that both the Michigan State Police officer who investigated the death and an inmate who knew Cherry confirmed that the drugs that killed him were smuggled into the Macomb Correctional Facility by MDOC employees. ECF No. 1, PageID.9. Furthermore, it was allegedly "well known" throughout the prison that drugs were supplied to prisoners through MDOC employees. *Id.*

The Estate alleged a few instances of drug smuggling both throughout the MDOC system and specifically at the Macomb Correctional Facility. First, in 2016, an officer at a correctional facility in Adrian, Michigan, reportedly smuggled drugs into the facility. ECF No. 1, PageID.4–5; ECF No. 10, PageID.51–52. According to the complaint, no investigation occurred, and two prisoners involved in reporting the drug smuggling were killed in MDOC custody. ECF No. 14, PageID.117. Also in 2016, an officer at a correctional facility in Jackson, Michigan, reported that another officer was smuggling drugs into the facility. *Id.* The reporting officer allegedly experienced retaliation and was later fired by MDOC, only to be reinstated. *Id.* at PageID.118.

The complaint also detailed that in 2025, a whistleblower named "Abe" noted that he had been reporting drug smuggling and MDOC collusion to administrators for several years, but the MDOC administrators "actively attempted to suppress and prevent drug-related investigations." *Id.* Specifically, the complaint alleged that Defendant Washington pressured MDOC employees not to investigate drug

smuggling incidents because it would make MDOC "look bad," as they "do not investigate [their] own." *Id.*; ECF No. 1, PageID.6.

As to the Macomb Correctional Facility that housed Cherry, the Estate alleged two separate instances of drug smuggling. In December 2021, about ten months prior to Cherry's death, another prisoner at the facility died from a heroin and fentanyl overdose. ECF No. 14, PageID.119. A whistleblower reported that prison gangs inside conspired with correctional officers to distribute drugs throughout the prison. ECF No. 14, PageID.119; ECF No. 1, PageID.7. After the reports became public in early 2022, the whistleblower alleged that the gangs retaliated against him while MDOC employees did nothing to stop the attack. ECF No. 14, PageID.119–120. Second, on September 25, 2022, a week before Cherry's overdose, an MDOC officer, Miguel Priest, was arrested after he attempted to smuggle drugs and phones into the Macomb Correctional Facility. *Id.* at PageID.120. The Estate alleged that Defendants failed to investigate the incident.

After Mr. Cherry's overdose, Cherry's mother was reportedly contacted by an inmate who confirmed an MDOC employee had smuggled the drugs that caused Cherry's death and that it was well known throughout the facility that drugs were being smuggled in by MDOC employees. ECF No. 1, PageID.9. The Estate alleged that Defendants knew of the operations and dangers caused by the presence of drugs and still failed to investigate drug smuggling at the facility. ECF No. 14, PageID.121.

II. Procedural Background

Plaintiff sued five Defendants, all MDOC employees in their individual capacities. Defendants Dalton and Herbert are both inspectors at the Macomb Correctional Facility. Defendant Stephenson is the warden at the facility. Defendant Washington is the director of MDOC and Defendant Chapman was the assistant deputy director of the Correctional Facilities Administration. ECF No. 1 PageID.2–3.

The Estate brought three separate constitutional claims under 42 U.S.C. § 1983. First, it alleged that all Defendants violated the Eighth Amendment by failing to protect Mr. Cherry when they refused to curb the spread of illegal drugs in the Macomb Correctional Facility. ECF No. 1, PageID.11–12. Second, the Estate brought a substantive due process, state-created danger claim under the Fourteenth Amendment against all Defendants because they knew drugs were smuggled into the facility and refused to stop it. *Id.* at PageID.13–14. Finally, the Estate sued Defendants Washington, Chapman, and Stephenson for "Supervisory Liability" because they "maintained a policy" that allowed drugs to be smuggled into the prison. *Id.* at PageID.15–16.

Defendants moved to dismiss the complaint in its entirety and asserted qualified immunity. The Court held a hearing on July 9, 2026. It will address each argument in turn.

## LEGAL STANDARD

The Court must grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if the complaint fails to allege facts that exceed a speculative level

of plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2008)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The Court must view the complaint in the light most favorable to the plaintiff, presume all well-pleaded factual assertions as true, and draw reasonable inferences in the nonmoving party's favor. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). The Court need not credit a plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 678.

In a Rule 12(b)(6) motion, courts can only "consider the [c]omplaint and any exhibits attached thereto . . . [and] items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430 (citation omitted); *see also Decoration Design Sols., Inc. v. Amcor Rigid Plastics USA, Inc.*, 553 F. Supp. 3d 424, 427 (E.D. Mich. 2021) (Murphy, J.).

## DISCUSSION

### I. Failure to Protect

The Estate alleged that Defendants violated Cherry's Eighth Amendment rights when they failed to protect him from the dangerous drugs that were smuggled into and distributed inside the prison. ECF No. 1, PageID.11–12. Defendants moved to dismiss the claim because it argued the complaint did not adequately plead an objectively serious harm or that Defendants subjectively knew about the risk and disregarded it. *See* ECF No. 10, PageID.56–63.

The Eighth Amendment prohibits prison officials from “inflict[ing]” “cruel and unusual punishments.” U.S. Const. amend. VIII; *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Further, prison officials may violate the Constitution when they fail to protect inmates because it is an Eighth Amendment violation to “display deliberate indifference to a sufficiently serious risk of harm from which they owe an inmate protection.” *Caraway v. CoreCivic of Tennessee*, LLC, 98 F.4th 679, 683 (6th Cir. 2024) (first citing *Estelle*, 429 U.S. at 104; and then citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (citation modified). To adequately plead a failure to protect claim, a plaintiff must plead an “objectively excessive risk of harm,” the objective prong, and that the official knowingly disregarded the excessive risk, the subjective prong. *Id.* at 683, 686.

*A. The Objective Prong*

The objective prong requires the risk of harm to be “sufficiently serious” and “objectively excessive.” *Zakora v. Chrisman*, 44 F.4th 452, 469 (6th Cir. 2022); *Caraway*, 98 F.4th at 683 (citing *Farmer*, 511 U.S. at 837). “In other words, the prisoner must show that the risk of which he complains is not one that today’s society chooses to tolerate.” *Helling v. McKinney*, 509 U.S. 25, 36 (1993). There also must be a causal connection between the defendant’s act or omission and the harm suffered. *Caraway*, 98 F.4th at 685 (6th Cir. 2024).

For Eighth Amendment cases that allege unfettered access to drugs in prison, two recent Sixth Circuit decisions guide the Court’s analysis and warrant further

discussion: *Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022), and *Caraway v. CoreCivic of Tennessee, LLC*, 98 F.4th 679 (6th Cir. 2024).

In *Zakora*, the plaintiff was found dead in his cell at an MDOC facility due to a fentanyl overdose. 44 F.4th at 460–61. His estate brought a failure to protect claim and argued that prison officials failed to mitigate the overdose risk caused by the access to drugs. *Id.* at 462. The Sixth Circuit reversed the district court's dismissal as to the failure to protect claim because Zakora plausibly stated an objectively serious risk of harm based on the "unfettered access to deadly drugs inside a prison." *Id.* at 470–71. In *Caraway*, the Sixth Circuit noted that three specific allegations "drove *[Zakora's*] conclusion." 98 F.4th at 684.

> First, the complaint contained detailed allegations about the "widespread presence of drugs" at Zakora's facility. Second, in the two days before Zakora's overdose, two other inmates in his twelve-to-sixteen-inmate unit had also overdosed. Third, prison officials failed to investigate those overdoses. Taken together, those factual allegations permitted the reasonable inference that Zakora had "unfettered access to deadly drugs" in prison, creating an objectively excessive risk of overdose.

*Id.* (citation modified). The Sixth Circuit noted that *Zakora* emphasized that "simple exposure to drugs, without more, does not violate contemporary standards of decency." *Zakora*, 44 F.4th at 472. Rather, the unfettered access to drugs, particularly because they were present in Zakora's unit, satisfied the objective prong of an Eighth Amendment claim. *Id.*

Two years later, in *Caraway*, the Sixth Circuit considered a similar prisoner overdose Eighth Amendment claim but came to a different conclusion. Caraway was confined in a Tennessee prison, operated by CoreCivic, Inc. Staff found him

unresponsive in his cell and transported him to a hospital where he died shortly after due to a fentanyl overdose. *Caraway*, 98 F.4th at 681–82.

The Sixth Circuit limited the *Zakora* holding to its facts and noted that the "conclusion was a limited one" as the court in *Zakora* was "careful to highlight the egregiousness of Zakora's circumstances." *Id.* at 684. Caraway's complaint did not plausibly allege an Eighth Amendment violation because it did not allege "unfettered access to deadly drugs." *Id.* Rather, only one of the three factors from *Zakora* were arguably present in *Caraway*. *Id.*

Though it did not definitively decide the first factor—whether Caraway alleged the widespread presence of drugs—the court noted that there were no allegations similar to the back-to-back overdoses in Zakora's own unit. *Id.* at 684. Rather, Caraway's allegations only noted "some broad statements about overdoses in CoreCivic facilities." *Id.* It stated clearly that the "mere allegation that inmates have overdosed—even at an increased rate—*doesn't come close* to showing the kind of excessive, one-for-every-eight risk Zakora faced." *Id.* (emphasis added). Caraway therefore did not satisfy the second factor present in Zakora's case. Third, Caraway did not allege that the prison officials failed to investigate because there were "no immediat[e] prior overdoses" at the specific facility, so "prison officials couldn't have failed to investigate them." *Id.* at 685. Though Caraway attempted to include allegations about the failure to respond to the drug problem, they were not specific to Caraway's overdose, and thus were "a far cry from Zakora's specific, close-in-time failure." *Id.*

Though the Estate did not address *Caraway* in its response brief, *see* ECF No. 14, at the motion hearing, it attempted to distinguish the case from the facts present here. It argued that the three factors from *Zakora* are not exclusive and that *Caraway* covered a different context than *Zakora* and the instant case. The Court disagrees. *Caraway* confronted a similar Eighth Amendment failure to protect claim based on access to drugs in prison. The Sixth Circuit chose to consider the three factors from *Zakora* to determine whether Caraway's claim was sufficiently "extraordinary." *Caraway*, 98 F.4th at 684. When confronted with similar facts here, the Court must follow Sixth Circuit precedent and do the same.

The instant case is closer to the allegations in *Caraway* than in *Zakora*, thus, the Estate's Eighth Amendment failure to protect claim must fail.

First, the Court must consider whether the complaint sufficiently alleged the widespread presence of drugs in the facility. *Caraway*, 98 F.4th at 684. Unlike *Zakora*, the only overdose that the complaint pointed to from the same facility was nearly ten months before Cherry's death. The other Macomb-specific allegations were that a Corrections Officer was caught attempting to smuggle drugs into the facility a week earlier and that a whistleblower reported that corrections officers were smuggling drugs into the facility, including drugs responsible for the inmate's death ten months prior. ECF No. 1, PageID.7.

The Court could well conclude that the complaint plausibly alleged the presence of drugs inside the facility. Attempted smuggling, a whistleblower allegation of widespread drug smuggling at the facility, and an overdose death within a calendar

year suggests the presence of drugs in the facility. Unlike *Caraway*, the Estate's allegations are sufficiently specific for the Court to conclude that the complaint satisfied the first factor by plausibly alleging the presence of drugs in the year prior to Cherry's death. The Court, however, need not decide whether the allegations are enough for the *widespread* use of drugs inside Macomb Correctional Facility, "as the estate has failed to allege *Zakora*'s two other key facts." *Caraway*, 98 F.4th at 684.

Second, there was not an immediate prior overdose here, let alone two. *See id.* Two immediate prior overdoses in *Zakora* "evidenced an objectively serious risk of harm." *Caraway*, 98 F.4th at 684 (citation modified). But here, the only prior overdose was ten months before Cherry's death. *Zakora*'s close-in-time and close-in-proximity overdoses were crucial to the Sixth Circuit's holding. *See Zakora*, 44 F.4th at 470; *Caraway*, 98 F.4th at 684–85. And even crediting the whistleblower's allegations, no allegation exists that the drugs were in close proximity to Cherry's unit at the prison in the days prior to his overdose. *See also Calvin v. CoreCivic, Inc.*, No. 3:23-cv-00447, 2026 U.S. Dist. LEXIS 63185, at *32 (M.D. Tenn. Mar. 25, 2026).

There simply are no allegations that come close in time or in proximity to Cherry's death to establish an objectively serious risk of harm. *See Caraway*, 98 F.4th at 684 (explaining that "the mere allegation that inmates have overdosed—even at an increased rate—doesn't come close to showing the kind of excessive, one-for-every-eight risk Zakora faced"). And absent more detailed allegations, the Court cannot infer that there was "unfettered access" to drugs like there was in *Zakora*.

Third, the Estate's allegations do not demonstrate that the prison failed to investigate the circumstances leading up to Cherry's death. *See id.* at 685. In *Caraway*, the court noted that "generalized allegations" about the defendants' failure to respond to the alleged drug problem were not specific or close enough in time. *Id.* Here, the Estate alleged that Defendants generally failed to investigate the drug problem in all MDOC facilities and the Macomb Correctional Facility. *See* ECF No. 1, PageID.5–6, 10, 13. The only specific allegation that is sufficiently close in time to Cherry's death was the allegation that a corrections officer was caught attempting to smuggle drugs in a week prior and the state failed to launch an investigation. *See* ECF No. 1, PageID.8.

The Estate's allegation, though, does not meet *Zakora*'s standard because, like *Caraway*, there were no immediate prior overdoses, so prison officials could not have failed to investigate them. *See Caraway*, 98 F.4th at 685; *see also Greer v. Braman*, No. 1:25-cv-1487, 2026 WL 2339162 (W.D. Mich, June 16, 2026), *R. & R. adopted* No. 1:25-cv-1487, 2026 WL 2089227 (W.D. Mich., July 21, 2026) (explaining that the plaintiff did not adequately plead a failure to investigate because the "allegations of overdose, without any details, [were] either too remote in time, and/or without specific facts regarding location to [the plaintiff's] prison unit"). What is more, the allegation that an officer was *caught* smuggling drugs into the facility directly contradicts the allegation that prison officials both did not address the drug issue or failed to investigate.

The presence of drugs in prisons is unacceptable, and even more unacceptable are prison officials who are complicit in drug smuggling operations. The Estate adequately alleged the presence of drug smuggling activities at the Macomb Correctional Facility in the years and months before Cherry's death. Still, the mere presence of drugs does not automatically mean that a prisoner's Eighth Amendment rights were violated. *See Caraway*, 98 F.4th at 685. The Court is bound by the Sixth Circuit's holdings in *Zakora* and *Caraway*. And *Caraway* significantly cabined *Zakora*. The instant complaint alleged the presence of drugs in the facility, attempted smuggling into the facility a week prior to Cherry's death, and an overdose death ten months before Cherry's death. Those allegations, while serious, are not enough to satisfy the exacting standard set forth in *Zakora* and *Caraway*.

To conclude, because Plaintiff did not plausibly allege facts to meet the objective prong of an Eighth Amendment violation, the Court need not consider the subjective prong of the Eighth Amendment inquiry. *See Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021).

II. State-Created Danger

Next, Defendants moved to dismiss the Estate's state-created danger claim that was premised on the allegation Defendants knew drugs were smuggled into the facility and refused to stop it. *Id.* at PageID.13–14. The state-created danger claim is a substantive due process claim that the Sixth Circuit first recognized in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998). *Rhodes v. Michigan*, 10 F.4th 665, 684 (6th Cir. 2021). There, the court noted that liability under the doctrine "is

predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom*, 136 F.3d at 1066. It is a "demanding standard," *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006) (citation omitted), because generally "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).

Plaintiff must meet three elements for a state-created danger claim:

> First, a state official must take an affirmative act that creates or increases the risk that a victim will be harmed by a private actor. Second, this risk must pose a special danger to a specific victim—meaning a danger, to that victim, greater than the danger to the public generally. Third, the state official's conduct must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

*Franz v. Oxford Cmty. Sch. Dist.*, 132 F.4th 447, 451 (6th Cir. 2025) (citations omitted).[1] Under the doctrine, the "failure to act is not an affirmative act . . . ." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003).

Defendants moved to dismiss the Estate's state-created danger and argued that the Estate did not plausibly allege that any Defendant took an affirmative act to

[1] The parties agreed on the elements for a state-created danger claim from older Sixth Circuit cases that are slightly different than those set forth more recently by the Sixth Circuit in *Franz*. *See* ECF No. 10, PageID.64; ECF No. 14, PageID.141; *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). The Court will proceed to its analysis with the most recent factors the Sixth Circuit established in a published case. Regardless of the correct test, the only dispute here concerns the first element, and the inquiry on it remains the same in the Sixth Circuit's test employed by both *Cartwright* and *Franz*.

create a danger to Cherry. ECF No. 10, PageID.63–65.[2] The Estate responded and argued that the Estate plausibly alleged that Defendant Washington took an affirmative act by "pressur[ing] facilities to not investigate reports of MDOC employees smuggling drugs into facilities." ECF No. 14, PageID.141.[3]

The Estate's state-created danger fails at the first element because it did not allege that Defendant Washington took an "affirmative act" that either created or increased the risk to Cherry at the prison. The Estate argued that Defendant Washington created the danger by pressuring subordinates not to investigate drug smuggling reports at MDOC facilities because it would make MDOC "look bad," and because MDOC does not "investigate [its] own." ECF No. 14, PageID.141–142; ECF No. 1, PageID.6.

The Estate's claim fails for a few reasons. First, a failure or refusal of state officials to investigate potential harms is not an "affirmative act." *See, e.g.*, *May v. Franklin Cnty. Comm'rs*, 437 F.3d 579, 584–86 (6th Cir. 2006) (explaining that officers who departed from a domestic violence call without taking steps to reduce the risk of harm did not commit an affirmative act). True enough, the allegation here is

---

[2] Defendants did not address the second and third factors in their moving brief. *See* ECF No. 10, PageID.63–65. The Court will not consider new arguments raised in a reply brief. *See Sundberg v. Keller Ladder*, 189 F. Supp.2d 671, 682–83 (E.D. Mich. 2002) (noting that "it is not the office of a reply brief to raise issues for the first time").

[3] Though the Estate brought Count II against all Defendants for state-created danger, ECF No. 1, PageID.13, in response to Defendants' motion, the Estate only argued it plausibly alleged a state-created danger claim as to Defendant Washington. ECF No. 14, PageID.140. The Court will therefore consider the Estate to have waived any state-created danger claim against the other Defendants.

more than a state official's silent refusal to investigate drugs in prison and may come closer to an affirmative act than the run of the mill failure to investigate claim. But the Court does not see a logical difference between MDOC's leader failing to investigate and an instruction directed to subordinates not to investigate.

*Langdon v. Skelding*, 524 F. App'x 172 (6th Cir. 2013), is instructive here. There, the Sixth Circuit found that there was no affirmative act where, after receiving multiple child abuse complaints, Child Protective Service closed each investigation. Later, a minor died in a house fire due to the parents' abusive conduct. *Id.* at 172–74, 175–77. Just like *Langdon*, as the Estate noted, Defendant Washington's alleged instruction may be "active behavior," *see* ECF No. 14, PageID.141–142, but that alone is not enough to satisfy the affirmative act element.

And even if pressuring subordinates could be considered "an affirmative act," it does not meet the second part of the first prong that the action must either create or increase the risk to Plaintiff. *See Franz*, 132 F.4th at 451. In determining whether an affirmative state act increased the risk of harm to an individual, the question is whether the individual "was safer before the state action than . . . after it." *Cartwright*, 336 F.3d at 493.

The complaint alleged that drugs were widespread in MDOC facilities, and Defendant Washington failed to intervene. Even without Defendant Washington's refusal to intervene, the risk remained the same. The entire time, dangerous drugs were available in the prison that prisoners could ingest and potentially suffer overdose. The Court cannot say that Cherry was safer in prison with drugs around

him before Defendant Washington's alleged instructions not to investigate. Accordingly, the Estate did not allege any action taken by Washington that either created or increased the danger to Cherry. Thus, the state-created danger claim must fail.[4]

III. Failure to Supervise

Plaintiff also sued Defendants Washington, Chapman, and Stephen and alleged they are subject to supervisory liability under the Fourteenth Amendment because they failed to train and supervise their subordinates to prevent drugs from being smuggled into the prison. ECF No. 1, PageID.15–16.

"Individual liability on a failure-to-train or supervise theory must be based on more than respondeat superior, or the right to control employees." *Zakora*, 44 F.4th at 475 (citation modified). In other words, liability cannot attach to a supervisor based on their mere failure to act. *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). Instead, supervisory liability requires the supervisor to have played an active part in the alleged violations. *Id.* (citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). And "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006).

[4] Defendants argued, in a footnote in their moving and reply briefs, that the Estate's state-created danger claim fails as the decedent's death was not the result of a private act of violence. ECF No. 10, PageID.65; ECF No. 16, PageID.170. The Estate responded, in another footnote, that state-created dangers claims are not limited to injuries caused by private acts of violence. ECF No. 14, PageID.140. The Court may have considered the argument but for the inadequate briefing on a less than clear issue.

Because the Court found that no individual Defendant engaged in unconstitutional conduct above, the Estate cannot sustain a supervisory liability claim against Defendants Washington, Chapman, and Stephenson. *See Buck v. City of Highland Park*, 733 F. App'x 248, 254 (6th Cir. 2018) ("But a prerequisite to establishing liability under § 1983 for failure to train is that a constitutional violation has occurred."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (same).

IV. Qualified Immunity

Finally, Defendants invoked qualified immunity. ECF No. 10, PageID.68. Defendants argued that even if the Estate stated a constitutional claim, they are entitled to qualified immunity as the constitutional violation was not clearly established. *Id.* at PageID.68–71. To overcome a claim of qualified immunity on a motion to dismiss, a plaintiff must "plausibly allege facts showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Once a defendant asserts qualified immunity, the plaintiff bears the burden to overcome it. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

As noted above, the Estate did not plausibly allege facts that any official violated Cherry's constitutional rights. Accordingly, because the first prong of qualified immunity is dispositive here, the Court need not address whether the

asserted rights were "clearly established." *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Defendants' motion to dismiss [10] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' motion to seal [11] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's ex parte motion for leave to exceed the page limit [13] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: September 29, 2026